

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS
## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

$9/14,576$  May 19, 1939

Honorable James E. Kilday, Director
Motor Transportation Division
Railroad Commission of Texas
Austin, Texas

Dear Sir:

Opinion No. O-739
Re: Whether Railroad Commission has
authority to change Permit No.
12410 to remove certain restrictions
and place the permit in conformity
with the original Class B Permit
No. 5182.

We are in receipt of your letter of May 2, 1939, wherein
you outline the following facts:

"Class B Permit No. 5182, which was issued September
27th 1929 by the Railroad Commission, should properly
have been issued at that time in the name of 'Central
Forwarding, Inc.,' but for some reason it was issued to
'Central Freight Lines, Inc.' Thereafter, Special Com-
modity Permit No. 12410 was issued in lieu of the Class
B Permit No. 5182 and was issued properly as to name to
Central Forwarding, Inc. However, in making the cor-
rection as to name and in issuing Special Commodity
Permit No. 12410 in lieu of Class B Permit No. 5182, the
Commission either inadvertently or arbitrarily changed
the terms of the territory to and from which the operation
was authorized, placing restrictions on Permit No. 12410
which were not placed on the original Class B Permit
No. 5182."

You also handed us your files on the above permits, from
which we find the following facts, to-wit: On June 27, 1929, Central
Freight Lines, Inc., filed Application No. 5182, and on September 27,
1929, the Railroad Commission of Texas issued to the said Central
Freight Lines, Inc., Class B Permit No. 5182, authorizing the said
Central Freight Lines, Inc., to operate as a Class B Motor carrier
"within the State of Texas and substantially within the territory
as follows: In and around Waco, Texas, and to and from all other

NO COMMUNICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ATTORNEY GENERAL OR FIRST ASSISTANT

incorporated cities within the State of Texas." On March 3, 1932, Central Forwarding, Inc., filed its application for what we will call a Special Commodities Permit, and on March4, 1932, the Railroad Commission of Texas issued to the said Central Forwarding, Inc., Special Commodity Carrier Permit No. 12410, authorizing the holder to operate as a Special Commodity Carrier "within the State of Texas and with the territory as follows: It is especially understood and agreed that this permit authorizes the transportation of the following commodities only: Livestock, milk, household goods and farm machinery. From: Waco to all points in Texas and from all points in Texas to Waco. Oil field equipment: To and from all points in Texas." On September 14, 1934, the Railroad Commission of Texas issued to the said Central Forwarding, Inc., corrected Permit No. 12410, in which the Central Forwarding, Inc., was allowed to carry the same commodities over the same territory, but with the following restrictions: "The transportation of the following commodities is prohibited from one dealer to another: household goods and farm machinery; the transportation of oil field equipment is restricted to that transported to or from actual oil fields and the carrier is prohibited from transporting same from one dealer or refinery to another dealer or refinery, or from a dealer to a refinery or from a refinery to a dealer." On June 22, 1937, the Railroad Commission of Texas issued to Central Forwarding, Inc., Special Commodity Carrier Permit No. 12410, authorizing operation as a special commodity carrier, as follows: "It is especially agreed and understood that this permit authorizes the transportation of the following commodities only: household goods, used office furniture and equipment, livestock, milk and farm machinery, from Waco to all points in Texas and from all points in Texas to Waco. Oil field equipment to and from all points in Texas. The transportation of household goods, used office furniture and equipment and farm machinery, is prohibited from one dealer to another dealer. The transportation of oil field equipment is restricted to that transported to or from actual oil fields and the carrier is prohibited from transporting same from one dealer or refinery to another dealer or refinery, or from a dealer to a refinery or from a refinery or a dealer."

You request our opinion "as to whether or not the Commission has authority to change Permit No. 12410 in order to remove the restrictions and place the permit in conformity with the original Class B Permit No. 5182."

In connection with your request, Honorable Tom P. Scott of Waco, Texas, Attorney for Central Forwarding, Inc., has submitted to us a written argument and brief, from which quotations are taken as follows: "The 1931 law provided that those that were then operating under Class B Permits would be entitled to the appropriate kind

of new certificate. Class B. Permit No. 5182 which was issued September 27, 1929, should properly have been issued at that time in the name of Central Forwarding, Inc., but through error it was issued to Central Freight Lines, Inc. Special Commodity Permit No. 12410 was issued in lieu of Class B Permit No. 5182 and was issued properly, as to name, to Central Forwarding, Inc. ... Central Forwarding, Inc., as a matter of law, was entitled to Permit No. 12410, issued without any restrictions in lieu of Class B Permit No. 5182. Through an error of the Commission the restriction was placed in said substitute permit. Central Forwarding, Inc., had a vested right in the Class B Permit, which through error of the Railroad Commission was taken away when it issued the Permit complying with the law of 1931. The Special Commodity Permit No. 12410 was issued without any notice to anyone and, therefore, we submit that the Railroad Commission had the right to correct the mistake as above set out, which was made when issuing same without giving notice. In other words, if notice is necessary for the correction of a mistake, it certainly would have been necessary in the first instance, and if it were not necessary in the first instance, it would follow, as a matter of law, that it would not be necessary to correct a mistake made when the permits were being changed in order to comply with the amendment of 1931."

We, therefore, construe your question to be in substance whether the Commission has authority to summarily change the permit in the manner mentioned by you.

House Bill No. 654, Chapter 314, page 698, General and Special Laws of Texas, Forty-first Legislature, Regular Session, 1929, placed motor carriers under the regulation of the Railroad Commission of Texas, and divided the same into two classes: The Class A Motor Carriers were what may now be called Common Carrier Motor Carriers. The Class B Motor Carriers as defined in the 1929 Act correspond roughly to what are now called Contract Carriers and Special Commodity Carriers. Section 5 of that Act provides that Class A permits couldbe sold and transferred. Section 6a of that Act prohibited the assignment of Class B permits. That Act contained no inhibition against the holder of a Class A permit also holding a Class B permit.

In 1931 the Legislature enacted more comprehensive statutes relating to the regulation of motor carriers, the same being Article 911b, Section 1 to 22. Section 6bb of said Article 911b prohibits the granting of a permit to operate as a contract carrier to any person operating as a common carrier. Under Section 5, Certificates of Convenience and Necessity authorizing operation as a

common carrier may be transferred, but the statute contains no provision for the transfer of any permit. Section 5 provided for the issuance of Certificates of Convenience and Necessity to those who were lawfully operating under such certificates at the time that Article 911b went into effect. However, said Article 911b contains no such provision as the one last mentioned with reference to any type of carrier except the common carrier.

Section 6a reads, in part, as follows:

"No motor carrier now operating as a contract carrier or that may hereafter desire to engage in the business of a contract carrier shall so operate until it shall have received a permit from the Commission to engage in such business and such permit shall not be issued until the applicant shall have in all things complied with the requirements of this Act; nor shall such permit be issued unless the character of business being done or to be done by the applicant strictly conforms with the definition of a contract carrier."

Section 6c reads as follows:

"No application for permit shall be granted by the Commission until after a hearing nor shall any such permit be granted if the Commission shall be of the opinion that the proposed operation of any such contract carrier will impair the efficient public service of any authorized common carrier or common carriers then adequately serving the same territory; provided, however, any person now lawfully operating as a Class "B" operator in this State who may desire to continue in the business of a motor carrier shall file an application for a permit or certificate under the terms of this Act within thirty (30) days after the effective date hereof and it shall be the duty of the Commission to determine such applications forthwith and such applicants may, subject to the provisions of this Act and to the orders, rules, rates and regulations of the Commission continue to operate as motor carriers pending the determination by the Commission of such application."

Section 6d, as amended in 1931, reads, in part, as follows:

"The Railroad Commission is hereby given authority to issue upon application to those persons who desire

stock feedstuffs, household goods, oil field equipment, timber when in its natural state, farm machinery and grain special permits upon such terms, conditions and restrictions as the Railroad Commission may deem proper, and to make rules and regulations governing such operations keeping in mind the protection of the highways and the safety of the traveling public; . . ."

Section 6d, as amended in 1937, and as it now exists, reads, in part, as follows:

"The Railroad Commission is hereby given authority to issue upon application to those persons who desire to engage in the business of transporting for hire over the highways of this State, livestock, mohair, wool, milk, livestock, feedstuffs, household goods, oil field equipment, and used office furniture and equipment, timber when in its natural state, farm machinery, and grain special permits upon such terms, conditions, and restrictions as the Railroad Commission may deem proper, and to make rules and regulations governing such operations keeping in mind the protection of the highways and the safety of the traveling public; . . ."

It is our understanding that Central Freight Lines, Inc., has been operating as a common carrier motor carrier at least since 1929. In fact, you have handed us a file which shows that on September 16, 1929, the Railroad Commission issued to the said Central Freight Lines, Inc., Certificate No. 2363, being a Class A Motor Carriers' temporary Certificate of Convenience and Necessity and that on February 21, 1930, the same was declared permanent by the Railroad Commission. The file further shows that on August 22, 1931, the Railroad Commission issued to the said Central Freight Lines, Inc., Common Carrier Motor Carriers' permanent Certificate of Convenience and Necessity No. 2627, in lieu of said Class A Certificate No. 2363.

It is immaterial for the purpose of this inquiry whether a special commodities carrier be classed as a common carrier, a contract carrier, or in a class by itself.

In view of the fact that Class B Permit No. 5182 was applied for by Central Freight Lines, Inc., it is clear that it was not any mistake on the part of the Railroad Commission that Permit No. 12410 was issued to Central Freight Lines, Inc., instead of to Central Forwarding, Inc. Central Forwarding, Inc., appeared as a stranger in 1931 when it filed its application resulting in the issuance of Permit No. 12410. Even if such permits be regarded as in the nature of certificates authorizing a limited kind of common

carrier service, Central Forwarding, Inc., could claim no "grand-father" rights in a certificate theretofore owned and operated by Central Freight Lines, Inc., there being no transfer of the certificate or permit. Even if there had been a transfer, or if Central Freight Lines, Inc., and Central Forwarding, Inc., be considered as one and the same (which we think cannot be done) the situation is unchanged. Central Forwarding, Inc., accepted the permit issued to it, not appealing from the order of the Commission granting Certificate No. 12,410, which it could and should have done if not satisfied.

If this permit be regarded as a contract carrier permit, or in a class to itself, an additional ground exists for our holding herein. As already noted herein, the only permanent advantage given by Article 911b to a carrier who was in operation at the time the article went into effect, was the advantage given to common carriers by section 5. The only advantage given by Section 6c to the contract carrier was that if he was lawfully operating as a Class b operator at the time said statute went into effect, then if he should file his application for a permit or certificate within thirty (30) days, he should have the right to operate as a carrier pending the determination by the Commission of his application for a permit. However, this statute did not guarantee to him the permit even though he had been operating under a Class B permit at the time such article went into effect. His application might be granted or it might be denied irrespective of prior operations. The holders of such permits had no property right in the highways and they had no vested right to operate thereon for private gain. The Legislature could prohibit or condition the operation of Class B Permit No. 5182, or any other permit as it might see fit. Stevenson vs. Binford, 53 Sup. Ct. Rep., 181; Railroad Commission vs. Inter-City Forwarding Company, 57 S.W. (2d) 290.

Our answer to your question, therefore, is that the Railroad Commission can not summarily remove the restrictions which were thus placed in Permit No. 12410. The procedure to be followed in amending this permit would be the procedure followed in obtaining a new permit of the same nature.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By /s/ Glenn R. Lewis
Assistant

ORL:FG

Approved: Opinion Committee
By R.W.K. Chairman

APPROVED
/s/ Gerald C. Mann
ATTORNEY GENERAL OF TEXAS